**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF INDIANA, THE STATE OF MARYLAND, THE STATE OF NEW MEXICO, THE STATE OF NEVADA, THE STATE OF TEXAS, <br><br> *ex rel.* CANDANCE CODE, <br><br>        *Relator*, <br><br> v. <br><br> HUNT VALLEY HOLDINGS, LLC f/k/a FUNDAMENTAL LONG TERM CARE HOLDINGS, LLC, <br><br> FUNDAMENTAL CLINICAL AND OPERATIONAL SERVICES, LLC, <br><br> FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC, <br><br> MAGNOLIA MANOR-INMAN, INC., <br><br> THI OF SOUTH CAROLINA AT MAGNOLIA MANOR-INMAN, LLC d/b/a MAGNOLIA MANOR-INMAN, <br><br> THI OF BALTIMORE, INC., <br><br> AND <br><br> H.I.G. CAPITAL, LLC d/b/a RELIANT REHABILITAION, <br><br>        *Defendants*. | Civil Action No.: <br><br> **Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

1

## COMPLAINT

1.    Relator Candance Code brings this action on behalf of the United States of America, the State of Indiana, the State of Maryland, the State of New Mexico, the State of Nevada, and the State of Texas, against Defendants Hunt Valley Holdings, LLC f/k/a Fundamental Long Term Care Holdings, LLC (hereinafter "Hunt Valley"), Fundamental Clinical and Operational Services, LLC (hereinafter "FCOS"), Fundamental Administrative Services, LLC (hereinafter "FAS"), Magnolia Manor-Inman, Inc. (hereinafter "Magnolia Manor-Inman"), THI of South Carolina at Magnolia Manor-Inman d/b/a Magnolia Manor-Inman (hereinafter "THI South Carolina"), THI of Baltimore, Inc. (hereinafter "THI") and H.I.G. Capital, LLC d/b/a Reliant Rehabilitation (hereinafter "Reliant Rehabilitation") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the following State False Claims Acts ("State FCAs"): the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5-2 *et seq.*, the Maryland False Claims Act, Maryland Code § 8-101 *et seq.,*  the New Mexico Fraud Against Taxpayers Act (FATA), § 44-9-1 *et seq.,* the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.040 *et seq.,* and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.002 *et seq.* to recover losses sustained by the United States Department of Health and Human Services (hereinafter "HHS") Centers for Medicare & Medicaid Services (hereinafter "CMS") due to the defendants' false claims to Medicare and creation of false records material to Medicare claims for therapeutic health services.

### I.    Introduction

2.    Reliant Rehabilitation is an outsourced provider of physical, occupational, and speech therapy services to skilled nursing facilities (hereinafter "SNF") and other medical

facilities. It claims to employ more than 9,000 licensed therapists that it provides to said facilities in forty states on a contractual basis.

3.     Magnolia Manor-Inman is a SNF located in Inman, South Carolina. It is directly owned by THI South Carolina and indirectly owned by Hunt Valley and THI, who also indirectly own 50 other nursing facilities in seven states.

4.     Relator Candance Code is an occupational therapist employed by Reliant Rehabilitation and assigned to Magnolia Manor-Inman. She conducts the initial consultations, submits treatment recommendations to the therapy supervisor based on her assessments, and provides therapeutic treatment. Code is regularly pressured to artificially inflate the recommended amounts of therapy needed, falsify her charts to reflect a greater amount of therapy time than actually spent, and to provide therapy even when medically inappropriate. Code has also witnessed this occurring with other therapists assigned to Magnolia Manor-Inman. When Code protested, she was overridden by her superiors and corporate regional directors. When a physical therapist also assigned to Magnolia Manor-Inman protested the fraudulent mandates, she was informed that the facility director would "catch hell" if she did not comply. The physical therapist declined to follow the mandate, and, as a result, she is no longer assigned to the facility. In another incident, a Nurse Practitioner employed at the facility was terminated as a result of her failure to accede to the fraudulent policies.

5.     Based upon what Code learned from interacting with her patients, other therapists, and nursing staff, Code is aware that Defendants knowingly submitted false claims to Medicare for therapeutic services, created false records material to false Medicare claims, and refused to discharge patients even when therapy became a physical impossibility. These FCA violations are outlined in more detail below.

## II.     Jurisdiction and Venue

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b).

7.     This Court has personal jurisdiction of the Defendants under 31 U.S.C. § 3732(a) because the Defendants can be found in and transact business in the District of South Carolina. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District.

8.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) because, at all times material and relevant hereto, the Defendants transacted business in the District of South Carolina and acts prohibited by 31 U.S.C. § 3729 occurred in this District.

9.     Relator's claims in this Complaint are not based on allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

10.     To the extent that there has been a public disclosure unknown to the Relator, she is the "original source" and meets the requirements of § 3730(e)(4)(B).  Relator has direct and independent knowledge of the information upon which the allegations are based, and has voluntarily provided this information to the government prior to filing this action under seal, as required by 31 U.S.C. § 3730(b)(2).

## III.     Parties and Other Key Players

11.     Relator Candance Code is a licensed occupational therapist. She has a Doctorate of Occupational Therapy from Chatham University and has been practicing in the occupational therapy field since 2006. She is trained in Medicare billing and Resource Utilization Groups (hereinafter "RUG") classifications. Code has been employed by Reliant Rehabilitation as an occupational therapist since 2009. Relator Code has direct knowledge of Defendants' concerted

and repeated efforts to overbill Medicare by, among others, inflating the RUG category of patients, manipulating the therapy minutes needed to increase billing, fraudulently claiming more therapy minutes than actually performed, and unnecessarily increasing the length of patients' stay, regardless of the patient's condition. She conducted her own investigations in furtherance of a False Claims Act *qui tam* action.

12.     The United States is a plaintiff in this action. Throughout the relevant time period, HHS and CMC were agencies of the United States and their activities, operations, and contracts were paid from United States funds. During the relevant time periods, Defendants provided services paid for by the Medicare programs.

13.     Upon information and belief, Defendant Hunt Valley is a Delaware limited liability corporation operating within the State of South Carolina, but it has no registered agent in the State of South Carolina. CMS has a website called Nursing Home Compare that publishes ownership information on all nursing homes that receive Medicare and Medicaid payments based on information provided by the nursing homes. In 2020, CMS' Nursing Home Compare disclosed Defendant Hunt Valley as the indirect owner of Magnolia Manor-Inman.

14.     Upon information and belief, Defendant FCOS is a Delaware limited liability corporation operating within the State of South Carolina, and it has a registered agent in the State of South Carolina. It can be served with process through its registered agent, Corporation Service Company, 1703 Laurel Street, Columbia, South Carolina, 29201. Defendant FCOS is the agent of Defendant Hunt Valley and manages, operates, and controls the clinical policies, procedures, and training at the nursing home on behalf of Hunt Valley.

15.     Upon information and belief, Defendant FAS is a Delaware limited liability corporation operating within the State of South Carolina, but it has no registered agent in the State

of South Carolina. Defendant FAS is the agent of Hunt Valley and manages, controls, and operates the financial and business administration of the nursing home on behalf of Hunt Valley.

16.    Defendant Magnolia Manor-Inman is a South Carolina corporation operating within the State of South Carolina, but it has no registered agent in the State of South Carolina.

17.    Defendant THI South Carolina is a Delaware limited liability corporation operating within the State of South Carolina, and it has a registered agent in the State of South Carolina. It can be served with process through its registered agent, Corporation Service Company, 1703 Laurel Street, Columbia, South Carolina, 29201.

18.    Upon information and belief, Defendant THI is a Delaware limited liability corporation operating within the State of South Carolina, but it has no registered agent in the State of South Carolina. CMS has a website called Nursing Home Compare that publishes ownership information on all nursing homes that receive Medicare and Medicaid payments based on information provided by the nursing homes. In 2020, CMS' Nursing Home Compare disclosed Defendant THI as the indirect owner of Magnolia Manor-Inman.

19.    Upon information and belief, Defendant Hunter Valley is the ultimate owner/operator of Defendants FCOS, FAS, Magnolia Manor-Inman, THI South Carolina and THI; they are related entities with common ownership and common control who participate in a joint venture to own, operate, and manage Magnolia Manor-Inman.

20.    Upon information and belief, Defendant Reliant Rehabilitation is a Delaware limited liability corporation operating within the State of South Carolina, but it has no registered agent in the State of South Carolina. H.I.G. Capital, LLC acquired Reliant Rehabilitation Holdings, Inc. in 2018 and continues to do business as Reliant Rehabilitation.

## IV.    Legal Framework

21.     The FCA provides, in part, that any person who:

(a)(1)(A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

[or]

(a)(1)(G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

Is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729. For purposes of the FCA,

[T]he terms "knowing" and "knowingly"—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud

22.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### V.     Medicare Skilled Nursing Facilities

### A.     <u>Medicare Part A Coverage of Skilled Nursing Facility Rehabilitation</u>

23.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. 42 U.S.C. §§ 426, 426A.

24.     The Medicare Program is divided into four "parts" that cover different services. Medicare A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

25.     Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c). The conditions that Medicare imposes on its Part A SNF benefits include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

26.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch.4, § 40.3.

27.     To be considered a *skilled* service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. 42 C.F.R. § 409.31(a).

28.     Medicare Part A will only cover those services which are reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for item or services…which…are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"). *See also* 42 U.S.C. § 1320c-5(a)(1), (2) (Providers must assure that that they provide services "economically and only when, and to the extent, medically necessary" and the services must "be of a quality which meets professionally recognized standards of health care").

29.     "Reasonable" and "necessary" services in the context of skilled rehabilitation therapy means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30 (Rev. 261, 10-04-19).

**B.     Medicare Part A Reimbursement Rates**

30.     Prior to October 1, 2019, and during the time the events detailed in this Complaint transpired, Medicare used the prospective payment system ("PPS") to reimburse SNFs, providing each facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).[1] *See also* RAI Version 3.0 Manual v.1.16 (effective October 1, 2018) (hereinafter "RAI 2018").

31.     PPS used a case-mix reimbursement methodology approach which classified SNF residents into one of a hierarchy of groups called Resource Utilization Groups (hereinafter "RUG"), based on "the resident's nursing and therapy needs, ADL [Activities of Daily Living]

---

[1] As of October 1, 2019, Medicare has changed to a Patient-Driven Payment Model ("PDPM"), a drastic overhaul designed to address concerns that a payment system based on volume of services created inappropriate financial incentives. The PDPM focuses on the patient's clinical characteristics, rather than the number of therapy minutes provided. 83 Fed. Reg. 39,183-243 (August 8, 2018).

impairments, cognitive status, behavioral problems, and medical diagnoses…Residents with more specialized nursing requirements, licensed therapies, greater ADL dependency , or other conditions will be assigned to higher groups in the RUG hierarchy. ***Providing care to these residents is more costly and is reimbursed at a higher level***." RAI 2018 6.2 (emphasis added).

32.     There were generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High ("RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

33.     The rehabilitation RUG level to which a patient was assigned depended upon the number of skilled therapy minutes a patients received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements under the RUG-IV classification system.

| RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | Minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least five days per week and a second discipline for at least three days per week |
| RV = Very High | Minimum 500 minutes per week total therapy; from at least one therapy discipline provided at least five days per week |
| RH = High | Minimum 325 minutes per week total therapy; one therapy discipline must be provided at least five days per week |
| RM = Medium | Minimum 150 minutes per week total therapy; must be at least five days per week but can be any mix of therapy |
| RL = Low | Minimum 45 minutes per week total therapy; must be provided at least three days per week but can be any mix of therapy |

63 Fed. Reg. at 26,262

34.     Medicare paid the most for those beneficiaries that fell into RU RUG level. The RU RUG level is "***is intended to apply only to the most complex cases requiring rehabilitative***

*therapy well above the average amount of service time***.**" 63 Fed. Reg. 26,252, 26, 258 (emphasis added).

### C.   Statements and Claims to Medicare for Payment of Skilled Nursing Facility Rehabilitation Therapy

35.     Medicare required nursing facilities to periodically assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set (hereinafter "MDS"). The MDS was used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare would pay a nursing facility to provide nursing and therapy to that patient. RAI 2018 6.2.

36.     In general, a SNF was to assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. Additionally, the SNF was to assess each patient on day 1, 2, or 3 following the last date of rehabilitation. The date the facility performed the assessment was known as the assessment reference date (hereinafter "ARD"). A nursing facility was to perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after. When a SNF performed its assessment (except for the first assessment), it looked at the patient for the seven days preceding the ARD. As discussed above, this seven-day period was known as the "look-back period." *See* Chapter 2 of the RAI 2018.

37.     Additional off-scheduled assessments may have been required when the patient's condition "changed to such a degree that it would no longer reflect the RUG-IV classification and payment assigned for a given SNF resident based on the most recent assessment used for Medicare payment." RAI 2018 6.4; 2.9.07.

38.    The MDS collected clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section O of the MDS ("Special Treatments, Procedures and Programs") collected information on how much and what kind of skilled rehabilitative therapy the SNF provided to a patient during the look-back period. In particular, Section O showed how many days and minutes of therapy nursing facility provided to a patient in each therapy discipline (*i.e.*, physical therapy, occupational therapy, and speech-language pathology and audiology services). Section G provided information on the patient's activities of daily living (ADL) assistance. The information contained in Sections O and G directly impacted the RUG level to which the patient was assigned.

39.    In most instances, the RUG level determined the Medicare payment prospectively for a defined period of time. 63 Fed. Reg. at 26,267.[2] For example, if a patient was assessed on day 14 of his stay, and received 720 minutes of therapy from at least two different therapy disciplines (one of which was at least five days during the week and one of which was at least three days per week), then the SNF would be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

40.    Completing the MDS was a requirement to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS itself required a certification by the provider that stated, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."

---

[2] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

Minimum Data Set (MDS) – Version 3.0 for Nursing Home Resident Assessment and Care Screening, Sec. Z0400.

41.     The SNF would then transmit the MDS data directly to CMS. 42 C.F.R. § 483.20(f)(3).

42.     A patient's RUG information was incorporated into the Health Insurance Prospective Payment System (hereinafter "HIPPS") code, which Medicare used to determine the payment amount owed to the SNF. The HIPPS code was included in the CMS-1450, also known as a UB-04 form, which the SNFs submitted electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment depended largely on the HIPPS code the facility submitted as part of the CMS-1450. 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

## VI.    Allegations of Defendants' False Claims

### A.    Defendants Systematically Pressured Rehabilitation Therapists to Fraudulently Inflate Minutes of Therapy Provided in Order to Claim Higher RUG Category and Increase Billing

43.     Relator Code provides initial evaluations of patients for occupational therapy needs, then recommends treatment based on a variety of factors, including the patient's need for therapy, as well as the patient's physical, mental, and emotional fitness for therapy. Her recommendation is submitted to the therapy supervisor, then the director of rehabilitation assigns the therapy minutes for each patient.

44.     Relator Code was regularly pressured to inflate her recommendation as to how much therapy each patient can and should receive. In addition, the director of therapy for Reliant Rehabilitation often added substantial minutes to the recommended therapy, overriding the clinical opinion of the therapist who evaluated the patient. In some cases,

even the Reliant Rehabilitation regional directors, who have no direct contact with the patients or their treatment plans, would unilaterally mandate augmented treatment plans and minutes of therapy. These augmented plans allowed Defendant Hunt Valley (and associated defendants) to claim a higher RUG category for the patients, and thus higher rates of payments from Medicare.

45.     The therapy director at Magnolia Manor-Inman sets the daily schedule for the therapists, based on the treatment plans. The schedule assigns a specific number of minutes of therapy for each patient on the schedule.

46.     Because the assigned quantity of therapy was inflated for most patients, there was often a significant discrepancy between the amount of time the therapist was scheduled to spend with each patient and the length of time it actually took to complete the therapy goals for that patient. For example, a patient may have been scheduled for 45 minutes of therapy, but it may only take 20-30 minutes to reach the therapy goal. When that happened, therapists were pressured to falsify their charts to reflect the amount of time they were *scheduled* to spend with the patient, rather than the *actual* amount of time spent with the patient.

47.     Reliable Rehabilitation required that all therapists meet an 88% productivity standard and that all therapy assistants meet a 92% productivity standard.[3] The productivity standard was based on the unreasonably inflated amount of treatment scheduled by the therapy director. Failure to meet the productivity standard could result in negative

---

[3] These productivity standards were prior to the October 1, 2019 changes to Medicare. Currently, therapists are required to meet an 88% productivity standard, while therapy assistants are required to meet a 95% productivity standard.

employment repercussions, including termination, pressuring therapists to fraudulently augment the number of therapy minutes on patients' charts.

48.     Therapists brought concerns about this practice to management at both Reliant Rehabilitation and Magnolia Manor-Inman, but they were ignored and the practices continued.

49.     Defendants also routinely billed Medicare for minutes of therapy when the patient refused to participate and no therapy occurred.  For example, Patient 2 refused therapy on June 4, 2019 and on May 13, 2019, yet Medicare was billed for 54 minutes of therapy and 25 minutes of therapy, respectively. On May 14, 2019, Patient 2 did briefly participate and walked one length of 80 ft., but then refused to do more. On this occasion, Medicare was billed for 60 minutes of therapy. Patient 3 refused all therapy on May 23, 2019, May 24, 2019, and May 27, 2019, yet Medicare was billed each of these days for "therapeutic activities." In yet another example, Patient 4 refused all therapeutic treatment on May 19, 2019, and further articulated that he wished to be discharged; however, Medicare was billed for 30 minutes of treatment.

**B.     Defendants Pressured Therapists to Provide Treatments That Were Medically Unnecessary and Unreasonable**

50.     Patients who deteriorated physically and/or mentally, and were thus intolerant of large therapy loads, were required to be re-assessed and their daily treatment minutes adjusted, which often lowered their RUG category. Defendants routinely failed to do this, thus maintaining the higher RUG category, though the therapeutic treatments had become medically unreasonable, unnecessary, and/or physically impossible.

51.     Magnolia Manor-Inman has a two-week discharge policy, mandating that every patient must remain on their assigned therapy schedule for two weeks before being

completely discharged. Therefore, from the moment that the treatment team determines that treatment is no longer medically appropriate, the facility requires that the team "provide" two additional weeks of therapy, whether it is appropriate or not.

52.     As a result of Defendants' relentless pressure and policies, many Medicare Part A patients were subjected to rehabilitative therapy that was medically unnecessary, unreasonable, and possibly harmful.

53.     For example, Patient 1 was unresponsive, dying, and should have been transferred to hospice care. Nevertheless, Relator Code was assigned sixty minutes of occupational therapy with the patient. She verbally requested to discharge the patient to hospice, but was told that they were required to continue "treating" the patient and should bill Medicare for at least two additional weeks. A Nurse Practitioner working with Patient 1 also attempted to discharge the patient to hospice, placing signed discharge paperwork in the patient's chart that was later removed and destroyed. The Nurse Practitioner's employment was terminated when she persisted in attempting to discharge Patient 1.

54.     In May and June of 2019, Patient 2 was in an advanced stage of dementia, was not suitable for physical and occupational therapy, and repeatedly refused treatment. Magnolia Manor-Inman insisted that he continue to receive treatments, despite treatment notes that described him as "inappropriate for physical therapy" and "respond[ing] poorly to therapeutic activities," as well as the patient's own refusal.

55.     Patient 4 refused treatment and declared his desire for a discharge. As a result, the physical therapist treating the patient would not sign off on further treatment for Patient 4 or authorize the physical therapy assistants, noting that the patient had a right to refuse treatment. Magnolia Manor-Inman's director had a heated argument with the

physical therapist regarding her decision and stated the director would "catch hell" if the physical therapist discharged Patient 4 without complying with the two-week discharge policy. The physical therapist maintained that the patient had a right to refuse treatment and is no longer scheduled at Magnolia Manor-Inman.

### C.     Defendant Reliant Rehabilitation's Policy Changes After Medicare Changed from PPS to PDPM

56.     As a result of the changes to Medicare's reimbursement system, Defendant Reliant Rehabilitation has dropped its insistence on increasing individual therapy minutes and now pressures its therapists to provide more group therapy, even when group therapy is not the most medically appropriate choice.

57.     For example, patients who would benefit more from individual therapy treatment are often placed into group therapies that are large in number of patients and dissimilar in therapeutic needs.

### VII.     Falsity

58.     Defendants submitted false claims to the U.S. Government for payment and created false records material to false claims for payment in several ways.

59.     The certifications completed by the Defendants for the patients at Magnolia Manor-Inman were false because they were based upon the false premise that the patients were receiving the therapy reflected in the treatment plans and the patients' charts, and that the patients had a continuing need for skilled rehabilitative services.

60.     The certifications completed by the Defendants for the patients at Magnolia Manor-Inman were false because they were based on the false assumption that the therapies prescribed were medically necessary and reasonable.

61.     Defendants entered false information into the MDS in order to categorize patients in a higher RUG level. Because the information related to patient treatment and amount of therapies were false, the case-mix adjustment resulted in an inflated upward adjustment to the PPS rate recorded on the CMS-1450.

62.     The CMS-1450 contained false statements and/or constitute false records because they contain false billing amounts.

63.     The medical records maintained by the Defendants for their patients contain false descriptions of treatment provided, false notations relating to the amount of time spent treating patients, and falsely state the medical need and reasonableness of the therapy.

## VIII.   Scienter

64.     Defendants knew that the patient charts and the Medicare claim forms were false in the following ways:

   a.  The recommended treatment plans were augmented by the Defendants themselves;

   b.  It was the Defendants who pressured the therapists to falsify patient charts regarding the amount of therapy minutes received;

   c.  It was the Defendants' policy that mandated two-weeks of additional therapy, even when medically unnecessary and/or unreasonable; and

   d.  Reliant Rehabilitation received complaints about the augmented treatment plans, but continued to base productivity standards on the inflated amounts.

65.     Based upon the Defendants' specific knowledge outlined above, Defendants had actual knowledge, were deliberately ignorant, or recklessly disregarded the

truth in making false claims for payment to Medicare or in creating records material to false claims to Medicare.

## IX.  Materiality

66.     The false statements contained in the patient charts and in the MDS were capable of affecting Medicare in the following ways:

    a.  The false statements concerning the amount of therapy minutes necessary for a particular patient could affect the initial RUG category the patient was placed in;

    b.  The false statements concerning the amount of therapy minutes actually performed could affect the RUG category the patient remains in as care is ongoing;

    c.  The false statements regarding the necessity and reasonableness of the therapy could affect whether the claim was reimbursable at all; and

    d.  The false statements affecting RUG classification could result in an inflated upward adjustment to the PPS rate recorded on the CMS-1450

## X.  Damages

67.     As a result of the knowing submission of false statements and the creation of false medical records, the Defendants induced Medicare to pay out claims for therapeutic services that did not occur, were not medically reasonable and necessary, and/or were billed at an inflated rate, thereby damaging Medicare in an amount to be determined at trial.

## XI.  Causes of Action

### Count One: Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)

68.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 67 as if fully contained herein.

69.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

70.     By virtue of misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for improper payment for medically unnecessary and unreasonable therapy treatments and lengths of stay by Medicare in violation of 31 U.S.C. § 3729(a)(1)(A).

71.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

72.     By reason of these payments, the United States has been damaged in a substantial amount and is entitled to recover treble damages and a civil penalty for each false claim.

### Count Two: Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B)

73.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 72 as if fully contained herein.

74.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

75.     During the relevant time period, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States. Specifically, Defendants knowingly submitted false MDS data directly to CMS which improperly inflated Defendants' Medicare Part A reimbursement.

Defendants' false reports caused the United States to pay inflated Medicare claims in violation of 31 U.S.C. § 3729(a)(1)(B).

76.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

77.     By reason of these payments, the United States has been damaged in a substantial amount and is entitled to recover treble damages and a civil penalty for each false claim.

### Count Three: Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C)

78.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 77 as if fully contained herein.

79.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

80.     By virtue of misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A) and/or 31 U.S.C. § 3729(a)(1)(B).

81.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

82.     By reason of these payments, the United States has been damaged in a substantial amount.

### Count Four: Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5-2 *et seq.*

83.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 82 as if fully contained herein.

84.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5-2(b).

85.     By virtue of the acts and misrepresentations described above, Defendants knowingly or intentionally presented, or caused to be presented, a false claim to the state for payment or approval in violation of IC 5-11-5.5-2(b)(1).

86.     By virtue of the acts and misrepresentations described above, Defendants knowingly or intentionally made or used a false record or statement to obtain payment or approval of a false claim from the state in violation of IC 5-11-5.5-2(b)(2).

87.     By virtue of the acts and misrepresentations described above, Defendants knowingly caused or induced another person to perform an act in violation of IC 5-11-5.5-2(b)(1) and/or IC 5-11-5.5-2(b)(2), and to defraud the state, in violation of IC 5-11-5.5-2(b)(8).

88.     Defendants conspired to commit violations of IC 5-11-5.5-2(b)(1) and/or IC 5-11-5.5-2(b)(2), in violation of IC 5-11-5.5-2(b)(7).

89.     By reason of these payments and violations, the State of Indiana has sustained actual damages.

**Count Five: Maryland False Claims Act, Maryland Code § 8-101 *et seq.***

90.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 89 as if fully contained herein.

91.     This is a claim for treble damages and civil penalties under the Maryland False Claims Act, MD Code § 8-101 *et seq.* and specifically §§ 8-102(b)-(c).

92.     By virtue of the acts and misrepresentations described above, Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of MD Code § 8-102(b)(1).

93.     By virtue of the acts and misrepresentations described above, Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of MD Code § 8-102(b)(2).

94.     Defendants conspired to commit a violation of the Maryland False Claims Act and defraud the government by virtue of the acts and misrepresentations described above, in violation of MD Code § 8-102(b)(3).

95.     By virtue of the acts and misrepresentations described above, Defendants knowingly made false or fraudulent claims against a governmental entity in violation of MD Code § 8-102(b)(9).

96.     By reason of these payments and violations, the State of Maryland has sustained actual damages.

### Count Six: New Mexico Fraud Against Taxpayers Act (FATA), § 44-9-1 *et seq.*

97.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1 through 96 as if fully contained herein.

98.     This is a claim for treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act ("FATA"), N. M. Stat. Ann. § 44-9-1 *et seq*. and § 44-9-3(A)-(C).

99.     By virtue of the acts and misrepresentations described above, Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to the state in violation of N. M. Stat. Ann. § 44-9-3(A)(1).

100.    By virtue of the acts and misrepresentation described above, Defendants knowingly made or used, or caused to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim in violation of N. M. Stat. Ann. § 44-9-3(A)(2).

101.    Defendants conspired to defraud the state by obtaining approval or payment on a false or fraudulent claim in violation of § 44-9-3(A)(3).

102.    By reason of these payments and violations, the State of New Mexico has sustained actual damages.

**<u>Count Seven: Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.040 *et seq.*</u>**

103.    Relator re-alleges and incorporates by reference paragraphs 1 through 102 as if fully contained herein.

104.    This is a claim for treble damages and civil penalties under The Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.040 *et seq.*

105.    By virtue of the acts and misrepresentations described above, Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of Nev. Rev. Stat. § 357.040(1)(a).

106.    By virtue of the acts and misrepresentations described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement that is material to a false or fraudulent claim in violation of Nev. Rev. Stat. § 357.040(1)(b).

107.    Defendants conspired to commit violations of Nev. Rev. Stat. § 357.040(1)(a) and/or § 357.040(1)(b) by virtue of the acts and misrepresentations described above, in violation of § 357.040(1)(i).

108.    By reason of these payments and violations, the State of Nevada has sustained actual damages.

<b>Count Eight: Texas Medicaid Fraud Prevention Act,<br>Human Resources Code § 36.002 <i>et seq.</i></b>

109.    Relator re-alleges and incorporates by reference paragraphs 1 through 108 as if fully contained herein.

110.    This is a claim for damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Hum. Res. Code Ann. § 36.002 *et seq.*

111.    By virtue of the acts and misrepresentations described above, Defendants knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of § 36.002(1).

112.    By virtue of the acts and misrepresentations described above, Defendants knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized in violation of § 36.002(2).

113.    By virtue of the acts and misrepresentations described above, Defendants knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact in violation of § 36.002(4).

114.    Defendants conspired to commit a violation of the Texas Medicaid Fraud Prevention Act in violation of § 36.002(9).

115.    By reason of these payments and violations, the State of Texas has sustained actual damages.

## XII.    Prayer for Relief

WHEREFORE, Relator, on behalf of the United States, prays that judgment be entered in her favor and against Defendants as follows:

1.      That Defendants cease and desist from violating the False claims Act, 31 U.S.C. § 3729 *et seq.*;

2.      That Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

3.      That the Relator be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1) and/or 31 U.S.C. § 3730(d)(2);

4.      That, with respect to the State False Claims Acts cited above, the Defendants pay the maximum damages and civil penalties permitted by those State statutes, and any other recovery or relief provided therein;

5.      That in the event that the United States proceeds with this action, the Relator, for bringing this action, be awarded an amount of at least fifteen percent but not more than twenty five percent of the proceeds of any award or the settlement of the claims;

6.      That in the event that the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than twenty five percent nor more than thirty percent of the proceeds of any award or settlement;

7.      That the Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

8.      That the Relator be awarded pre-judgment and post-judgment interest; and

9.     That Defendants be enjoined from concealing, moving, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and

10.     The Court award such other and further relief as is just, equitable, and proper;

### XIII.   Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, The Relator hereby demands a trial by jury.

This 13th day of November, 2020.

Respectfully submitted,

s/ Paul Murray_____
DCSC No. 12671
HAFEMANN, MAGEE & THOMAS, LLC
John R. Thomas, Jr. (*Pro Hac Vice Forthcoming*)
M. Brian Magee (*Pro Hac Vice Forthcoming*)
340 Eisenhower Drive, STE 1313
(540) 759-1660
Paul@fed-lit.com
jt@fed-lit.com
brian@fed-lit.com

*Counsel for Relator*

27